Good morning, Your Honor. May it please the Court, Michael Lynn for the appellant, David Hildes, who is sitting with us today over here. I would like to, if it's possible, reserve three minutes for rebuttal. Okay. The clock counts down. Your Honor, the reason why we're here is that the District Court refused to allow Mr. Hildes to add a Section 11 claim in this case because it held that when Mr. Hildes signed a voting agreement in proxy with Peregrine in April of 2000, he made a binding commitment to exchange his Harbinger stock for Peregrine stock in connection with the proposed stock for stock merger that was going to take place two and a half months later. And the Court said he effectively purchased the Peregrine stock on the date he entered into that voting agreement. And the Court then reasoned that because that date preceded the date of the false registration statement, his claim was barred under a so-called negative causation defense. We think that the District Court's ruling was wrong on both the facts and the law, and it should be reversed. The Directors have also, I think, recognized that the legal theory upon which the District Court ruled was suspect, and they have urged as an alternative ground that the ruling can be saved on the basis of an impossibility of reliance defense, relying on the Eleventh Circuit's decision, APA Excelsior v. Premier. We don't think that the panel has to reach this issue because if the panel finds that Mr. Hildes was not irrevocably committed, as a matter of fact, it doesn't have to reach the legal theory, whether it be negative causation or impossibility of reliance. However, should it choose to reach the impossibility of reliance defense that was articulated by the Eleventh Circuit, we think that it should reject that case and follow two decisions from the Southern District of New York, which have held that reliance is not – impossibility of reliance is not a defense to a section 11 clause. Let me ask a question that may or may not come under the rubric of reliance, but rather under at least the rubric of cause and effect. What would have happened if Peregrine, in the registration statement, had given the accurate numbers? A number of things would have happened. It would have been – the merger would never have taken place. And how do we know that? Here's why. When Peregrine, two years later, announced its corrective disclosures, it announced that 50 percent of its revenues, almost half of its business, had disappeared. The stock dropped 70, 80 percent. The market found that to be an extremely material fact. And to put this into context, when Mr. Hildes was asked to enter into this voting agreement, he had been given financial information about Peregrine, which showed that it had a steady upward trajectory. He'd been given the same information, essentially, that showed up in the registration statement, that was, of course, as it turned out, false. He was, but he was given – the information that he was given was later confirmed by that false registration statement. Or rather, not confirmed so much as restated. Restated. Reiterated. Yes, but it continued that upward trend. So had this company, instead of going like this, went like this, the merger would never have taken place. And tell me more of the mechanisms, because he has committed to vote his shares, but there were a lot of other shares that were not committed. I mean, it's always a tricky business to figure out how do you get rather inert shareholders to come in and vote one way or the other and so on. So tell me more. Yeah, let me tell you. He had – he and 13 other – I think it's 13 other officers and directors that entered into voting agreements that covered about 14 percent, 14 and a half percent of the common stock of Harbinger. The other 85 percent was held by common shareholders who had no voting agreements and could have voted without any restriction. Now, in order for this merger to be approved in Georgia, which is where Harbinger was, it had to be approved by 50 percent of the total amount of shares. Not just the amount of shares that voted, but 50 percent of the outstanding amount of shares. So it was a very high burden. That is to say there had to be an affirmative yes vote by 50 percent? Yes.  That's correct. So not just 50 percent of the voting shares, but 50 percent of the shares? Yes. Okay. That's right. So to go back in terms of – we talked about what would have happened. I think a lot of things would have happened had there been a truthful disclosure in the registration statement. Mr. Hildes could have done many things besides he could have gone to his board and asked them to sue Peregrine. He could have asked them to rescind the merger agreement with Peregrine. He could have asked the Peregrine – he could have asked the Harbinger directors to change their recommendation. So if we're talking cause and effect, and if you're right that if Peregrine had reported honestly, the real numbers in the registration statement, it would have blown up the merger. That would have had the effect then of Mr. Hildes not trading his shares for Peregrine shares. That's correct. So whether we call it reliance or not, the false registration statement had the consequence of making that trade go through. Another way of looking at his agreement to vote his shares that way was to say it's an irrevocable agreement that's contingent. That is to say it's not entirely irrevocable. It was contingent upon the occurrence of certain things. One of them, the most important being that the merger go through. That's exactly right. So how does that work then for you? Once we've got that straight just as a factual matter, what's that do in terms of law? Okay. In terms of the law, and this is where I think the problem with the district court and the problem with the directors are they are trying to use law that does not work. They're trying to essentially fit a square peg into a round hole. The district court used this theory of negative causation to try to bar Mr. Hildes' claim. But that theory is a theory of loss causation. And what we're really talking about here is transaction causation. Loss causation touches upon the reasons for the decline of the stock. That has nothing to do with this case. In our case, we've actually alleged that there was loss causation. It's not an element of a Section 11 claim, but we've alleged it. So the district court was focusing really on the wrong standard. It was trying to use negative causation to bar his claim. In effect, it was really using transaction causation, which is not an element under Section 11. Now, the directors, I think, recognize that there's a problem with the district court's analysis. And when you look at their brief, I think they spent four or five pages discussing negative causation and 30 pages trying to save this ruling by the district court using this impossibility of reliance defense that's only been accepted in this one court by the Eleventh Circuit. Well, you know, I'm going to telegraph the punch so the other side can get ready for it. As I read the Excelsior case, the facts are remarkably similar to the facts here. But the circuit court, in its opinion, said the argument based upon cause and effect, that is to say the merger would have blown up, had been waived. So the facts that were assumed for purposes of that case were that it was truly irrevocable. There was no contingency whatsoever. That's exactly right. So I don't see that case as having any real bearing on what the actual facts here are because that factual argument has not been waived here. That's exactly right, Your Honor. And just to give a little more perspective, the one time where the issue actually was contested in that case  and the district court denied the motion to dismiss, saying on the pleadings, just like in our case, the commitment theory does not apply, and they allowed the plaintiff to go forward for another few years. I'm not quite sure how it happened, but by the time it gets to the court of appeals, that argument's waived. It was actually – it was – it's a tortured history. I've read through every one of the decisions. It was a tortured history. But essentially, it was never argued. There was a law of the case issue where – I saw it all, and I don't want to talk about it. Okay. I agree with you. The only cases that the district court relied on to save its – or to use its negative causation defense are really inapplicable cases when you look at them. One of them was the World of Wonder case, which is a Ninth Circuit case, where it was a loss causation case. It wasn't a transaction causation case. And even in that case, the Ninth Circuit reversed, finding that as long as the misrepresentation touches upon a reason for the investment's decline, the case has to go forward. So that case is inapplicable. There was another case, Gunther, which was a tracing case. That's really an issue of standing. I mean, we're not talking about standing here. Under the statute, any person, as Your Honor has recognized in the Hertzberg case, any person who purchases a security pursuant to a registration statement has standing. Mr. Hilda's shares were purchased pursuant to that registration statement. So it's not an issue of standing. So that case is inapplicable. And there's one other case, which I believe was also another. It was the McKesson case, which was another case where, in that particular case, the plaintiff actually – his investment went up after he purchased the stock. And the Court rightly said, if you don't have a loss, why are you here? So there was no loss in that case. So all of the precedent that the district court relied on for its negative causation defense don't support that. And factually, I think when you look through the voting agreement and you look through the proxy and you look through the merger agreement and you see what the conditions were for the merger to be approved, one of the key provisions was there had to be a truthful registration statement. And I know I don't want to talk any further about APA, but that's a distinction. In the APA case, there wasn't that provision. And in this case, there is. There had to be a truthful registration statement. And there wasn't one. And I think that's the most important part of this case. And I think the district court erred by essentially interpreting the contract incorrectly. Your Honors, it's not an abuse of discretion type of standard. When a court looks at a contract, it's de novo. And that decision was incorrect and should be reversed. The only other thing I'll mention is that if we're even going to talk about the commitment theory, there's one other case that looked at the commitment theory. It's called SEC versus National Student Marketing. And I think it's a relevant case because it involves a situation not exactly like our case, but a situation where a purchaser and seller entered into agreement that was subject to a merger, and the court found that because the merger had bilateral conditions, the person wasn't locked in. That's the Barrington Parker case. I don't think that was a Section 11 case. It wasn't. But I understand the reasoning. That's right. And I think I'm going to save my rest for rebuttal. Thank you. Good morning, Your Honors. Harry Olivar from Quinn Emanuel for the Outside Directors. May it please the Court. I want to start with the two questions that Judge Fletcher asked that I think are both critical here. The first question was questions about what would have happened if the registration statement that came after Mr. Hildes' investment decision had been different. Had been accurate, not just different. Had been accurate, fair enough. And the answer was that other people might have done other things, that the companies might have behaved differently, that other shareholders might not have voted, et cetera. But the key question for a Section 11 claim is could Mr. Hildes have done anything differently? Well, wait a minute. That may or may not be the key question. What's the answer to the question I asked? Do you agree that it would have blown up the merger? Your Honor, we don't know what would have happened. It's all speculation. It seems to me very likely it would have blown up the merger. There is one possible outcome, certainly. But you're not willing to concede that that's the likely outcome? I will concede that the merger likely would have either not occurred on these terms or would not have occurred. Okay. Given that the facts, if we assume them to be false, are the same facts that had been given at the time of the initial transaction, fraud in the inducement claim might have also been a possibility, correct? That's correct, Judge Lucero. Based on the information Mr. Hildes did receive, he talks about the merger. That cuts against you, doesn't it? Oh, I don't think so. Because he received something other than the registration statement that contains similar information. And he would have had claims. He did have claims based on what he did receive at the time he made his investment decision. But is there any basis in the record that we can find or conclude, I shouldn't say find but conclude, that he was privy to the fact that those facts were false? I will assume from purposes of the claim he did not know. He says he relied on them. But what we're talking about is not a registration statement. We're talking about what he received at the time he describes as a Goldman Sachs opinion. Page 81 of the excerpt of the record. He says at the time I was relying on a Goldman Sachs opinion, which in turn relied on certain financial information. And we need to accept for this appeal that he received those materials, accept that they were false, and that he might have behaved differently. And that can give rise to claims. He could have brought a common law claim based on that, fraud and inducement, as Your Honor suggested, a state law blue sky claim. So he wasn't irrevocably committed to do anything? Well, he was irrevocably committed for purposes of a Section 11 claim. He was committed to do what? He was committed to give the vote of his shares to the public. And that's it? Well, he gave away the vote. On April 5th, he gave away the vote. He committed an irrevocable proxy. He no longer had the vote. In the merger context, the investment decision is the vote. So he gave it away. The question is, would he have a remedy based on what he received at the time? Yes, all sorts of remedies. But they wouldn't be a Section 11 claim because there was no registration statement at the time. He could have brought a 10b-5 claim. Aren't you essentially arguing that under your theory of the case, at the point where the agreement is signed, it seems to me you're arguing that you create a fraud-free zone. At that point, you can commit Section 11 fraud, but you are home free because there can be no claim at that point. It's too late. No, Your Honor. That's not correct. Section 11 is not a fraud claim. It's a strict liability claim, and there are strict requirements for bringing it. There has to be a registration statement. And there has to be a registration statement at the point of investment decision. Fair enough. There's no fraud-free zone. And there's nothing, you know, by the way, unfair. Mr. Hildes could have brought all sorts of claims against anyone who committed any wrongdoing. Common law claims. Rule 10b-5. State law blue sky claims. All of those were available to him based on what he had at the time he made his investment decision. And he brought those claims. He brought them against two officers. He brought them against Arthur Anderson, which audited the financial statements that were the basis for the Goldman Sachs opinion. All those theories were available. Mr. Hildes chose not to pursue those theories, and I think for good reason, against the outside directors. Because they didn't work at the company. They're not alleged to have known about the fraud. And all they did, all they're alleged to have done for purposes of the one claim remaining in this case is to have signed registration statements that were effective May 22nd, 2000. That's all that's alleged. And, you know, as ---- And I can see exactly why he's pursuing this suit. That's right. But as courts in the circuit have found, if you're going to pursue the relaxed liability standards, the strict liability, you need to meet the strict procedural requirements. Well, but let me ask you this. How important to your argument is the Excelsior case? Your Honor, we base our argument on ---- it's important, yes. We base it on six or seven decisions, all of which have faced this issue of the locked up, previously committed ---- But am I wrong in my reading of Excelsior, that is to say the facts of Excelsior are remarkably similar, but in its opinion, the Eleventh Circuit says we're going to take out of our consideration the fact that it was actually contingent. We are going to assume that it was irrevocable. Am I wrong in reading it that way? You're not wrong. So I don't view the case as actually very much on point for you because this is a different case then. Well, I do want to talk about the factual situation in AP Excelsior. We certainly cite it for the legal findings, which, you know, we believe, you know, are consistent with what's in the circuit. But let me ---- here's my understanding of Excelsior, and if I'm wrong about it or if you have a different view about it, you can tell me. My understanding of the analytic basis for the decision by the circuit is that it was truly irrevocable. It was just a flat-out commitment. There were no contingencies, no nothing. The facts were somewhat different, but that factual argument had disappeared. Am I correct in my description of Excelsior in this holding? That's how the Eleventh Circuit accepted the facts, and as ---- That is to say that it was truly irrevocable, no contingency, no nothing. And that's exactly the facts here as well. Mr. Hilda signed a truly irrevocable proxy. Well, you see, that's where we maybe differ in the use of the term irrevocable. This one's contingent. That is to say he votes that way and the merger goes through and the exchange takes place only after all these other things happen. That's exactly the facts in AP Excelsior. Well, I know, but those are the facts that are put to one side in the opinion. Well, it's because the district court suggested that was a basis for a defense. I understand that, but I'm trying to figure out what the rationale for APA is, and that rationale doesn't really work on the facts that we have here. Those facts were not contested on the appeal the way they are here, but the facts are identical. You want me to read to you the part of the Excelsior opinion that says that argument has been waived? I understand that argument was waived. The fact that those facts weren't contested on the appeal, but we have, you know, and I'm assuming there's a reason the appellate didn't contest it on the appeal, and irrevocable proxy is irrevocable. With respect to Mr. Hilda's, there's nothing more he could have done. He gave away his vote on April 5th before the registration statement existed. Yeah, but he didn't give away his stock. Yeah. In the reply brief, they point out he could have exchanged his Harbinger stock prior to the registration statement. He could have. Could he have done that? Correct. He was a locked-up investor. He could have found another locked-up investor. It's up to the same circumstances with a vote still given away. Because the decision to vote the shares was gone, there was no Section 11 claim by Mr. Hilda's or anyone he could have found to stand in his shoes. The vote was gone. In a merger, the investment decision is the vote. It was gone by April 5th. He gave it away to Peregrin. It was irrevocable. There's nothing he could have done. And factual arguments about what other people could have done can't be the basis for a Section 11 claim. The investment decision was made by Mr. Hilda's at the time. And there's no fact issue. These facts are in the record. The agreements are in the record. Mr. Hilda's situation is locked in. There are no further facts that can be developed there. And all we have is speculation about what other people might have done. You know, I'm having trouble with this. He very clearly committed themselves to vote his shares. And I don't assume even if the accurate numbers had been reported in the registration statement, I have no reason to think that he wouldn't have done exactly as he promised to do. On the other hand, the merger wouldn't have gone through, so he never would have sold his ñ never would have exchanged his stock. One slight correction, Your Honor. It's set forth in the record. He gave his vote to Peregrin to vote his shares. So he no longer ñ he didn't show up. Okay. Well, I'll say it slightly differently. The commitment he made that his shares would be voted the way Peregrin wanted them to be voted, that would have been kept. However, the merger would have blown up, so he never would have exchanged his shares because the merger wouldn't have gone through. Yeah. Your Honor, that very well may be, but that's not ñ I submit that's not a relevant consideration for a session like that. Let me ask you on that same point. As you say, he gave away ñ he contracted away his voting rights. But they were subject to two conditions, whether they're precedent or subsequent. It really doesn't matter very much. One was the approval of the merger by the company's shareholders, and the second was the acceptance ñ there were others, but the relevant ones ñ acceptance by the SEC of the to-be-filed registration. Now, doesn't that imply two things? One, that it is a proper filing, and secondly, an acceptance of the filing. And here, if it was fraudulent, as alleged, then there would have been no acceptance, and therefore the conditions of the transfer wouldn't have been met in the first instance. And it seems to me that that's a major problem for you. But persuade me why it isn't. Because the focus for a Section 11 claim ñ we're talking about a Section 11 claim. I understand. We're not talking about unfairness to Mr. Lewis. And the other kind of fraud. We're talking about Section 11 fraud. He had all these remedies that he could have brought against wrongdoers. There's no question about that. So we're focusing on the technical requirements of a Section 11 claim. And as all the courts who have addressed this issue have found, when someone is But is it locked up subject to conditions? Yeah. The only cases that ñ the two cases they cite are the Westinghouse case, where you really have ñ you don't have an individual shareholder who's locked up. You have two companies who've entered a deal. And their condition's back and forth. And they're negotiating on the day of the closing, and the registration statement becomes effective. There, where either company is free to back out, yes, that's conditional. That's not a commitment. That's the Westinghouse case. It's nothing like the facts here. The facts here, with respect to the investor we're talking about, Mr. Hildas, and whether he has a Section 11 claim, he's locked in on April 5th. Other people could have done other things. If the merger didn't close, then he wouldn't have a loss. But that's not the focus for a Section 11 claim by him. The question is locked ñ you say he's locked in. He is locked in. But the question is locked into what? He's not locked into exchanging his shares until the merger goes through. The cases have found that what matters, Your Honor, is the investment decision, not the subsequent share transfer. But the investment decision is also contingent upon the merger going through. I'm sorry. The investment decision is I will end up with Peregrine Stock once the merger has gone through. But the investment decision is what Mr. Hildas himself did, the decision he made. Well, that's the decision. I just described the decision he made. I decide that I will do this, and I will exchange my stock for Peregrine Stock if and when the merger goes through. The exchange happens automatically. Nothing more is required. Well, of course that happens automatically once the merger goes through. Correct. But the merger has to go through. Correct. But the only decision he made was complete by April 5th. That's supported by the record, and that's the relevant question. I totally grant you that the decision was complete, but we may be discussing what the decision was. The decision was I'll let Peregrine vote my shares, and if the merger goes through, my shares will be exchanged. That's right. I mean, that's the decision he made. That's right. The decision was to let Peregrine vote my shares. And I give away my vote, and if the merger goes through, I get a share exchange. That's the decision. And as made clear by SEC Rule 145, cited by both sides, the decision is the vote. The notice of adoption of the rule. It's important to remember that when Section 11 was adopted, it didn't apply to stock for stock mergers. From 1933 to 1972, there wasn't a Section 11 claim for a variety of reasons for anyone in a stock merger. In 1972, the new SEC rule came into play, and that rule made clear that the decision is the vote. In voting, the consenting shareholder accepts the stock, accepts the new security. So all that matters is did he give away his vote before the registration center? Let me have your view on one other aspect of the merger agreement. The merger agreement provided for termination if certain contingencies beyond the control, including, and then Section 5 said, upon a breach of any representation, warranty, or agreement by Peregrine, or if any representation or warranty of Peregrine shall have become untrue. How does that bear on our deliberation from your point of view? It bears on the rights of the companies, but not the rights of the plaintiff here. The plaintiff was irrevocably committed when he signed his irrevocable proxy. The companies could have done different things if representations and warranties turned out not to be true. The companies had their own remedies. Plaintiff's remedy. If he's going to choose the very strict requirements of Section 11, he needs to meet those requirements. He needs to fall within the purposes of the statute. Any rights he had would be derivative of the company. If the own the his rights terminated when he gave his vote. That's how you measure the Section 11 claim. If the company could have done something differently, maybe the transaction doesn't go through, that's relevant for causation and other claims. It's not relevant for a Section 11 claim. Courts for locked up investors who have purchased, who have given away their vote early before registration statement have found you can't have a Section 11 claim under those circumstances. All right. To sum up, Your Honor, I have about ten seconds. Mr. Hilda's didn't have a registration statement when he made his decision. He locked himself in irrevocably. There's no factual dispute about that. As Judge O'Sara pointed out, there are other claims he could have brought based on the information he had, but they don't include a Section 11 claim. Courts, as we submitted in the briefs, locked up investors who made their investment decisions early before registration statement don't have that claim. Thank you, Your Honor. Okay. Thank you very much. You've saved some time. Yes, Your Honor. We have left them for a chance. Okay. Okay. Thanks both sides for their arguments. Hilda's versus Arthur Anderson and John J. Moore's submitted for decision.
judges: Trott, Lucero, Fletcher